WILLIAM B. CAMPBELL *et al.*, Plaintiffs in Error, v.
DANIEL W. VAN HOUTEN, Defendant in Error.

**St. Louis Court of Appeals, March 10, 1891.**

Contract in Writing: IGNORANCE OF CONTENTS. A party who is
*sui juris* cannot, in the absence of fraud or imposition, deliberately
sign a written contract, and then escape its obligation on the
ground that he did not know its contents.

*Error to the St. Louis City Circuit Court.*—HON.
JAMES E. WITHROW, Judge.

REVERSED AND REMANDED.

*Geo. W. Taussig* and *Hugh D. McCorkle*, for
plaintiffs in error.

*A. R. Taylor*, for defendant in error.

THOMPSON, J.—This action was commenced before
a justice of the peace by a firm of merchants, doing
business at Shreveport, Louisiana, against the defend-
ant, a merchant doing business at St. Louis under the
name of "Robinson & Co." On trial anew in the
circuit court the defendant had a verdict and judgment,
and the plaintiff brings the case here by writ of error.

The evidence tended to show that the defendant
employed one Rowland, as a traveling salesman, at a
salary of $75 a month and expenses, to travel for him
and to sell his goods in the states of Arkansas, Lou-
isiana and Texas. Several letters of instruction from
the defendant to Rowland were put in evidence, from
which it appeared that the defendant furnished Row-
land with a price list of his goods, and gave Rowland
instructions to sell at the best profit he could obtain.
Armed with this authority, Rowland called upon the
plaintiffs at their place of business in Shreveport, and

Campbell v. Van Houten.

undertook to sell them one hundred and fifty barrels of potatoes, called "Early Ohio." After a bargain had been made for the sale of one hundred and fifty barrels, the plaintiffs, finding the terms advantageous to them and their stock in hand nearly exhausted, sent for Rowland and offered to take one hundred and fifty barrels more at the same rate. This offer was accepted, and thereupon the following memorandum of sale was drawn up and signed by Rowland:

"February 4, 1889.

"*Campbell Bros., Shreveport.*

"(From Robinson & Co., St. Louis, Mo.)

"Three hundred barrels (eleven peck barrels) choice eating Irish potatoes, guaranteed sound stock and fine keepers, like Hoosiers, at ($1.10) one and ten-hundredths dollars per barrel, delivered Shreveport, and not to sell any other shipment dealer, or work Palestine this trip south, for prompt delivery.

"T. C. ROWLAND,

"Agent."

Rowland at the same time telegraphed to the defendant at St. Louis by a night dispatch, as follows:

"SHREVEPORT, February 4, 1889.

"*Robinson & Co., Produce Dealers, St. Louis, Mo. :*

"Ship Campbell Bros. at Shreveport, Louisiana, three hundred barrels Ohio eating stock Irish potatoes, at one ten at once; notify them by wire car numbers and trace same. Ship quick; sold close, but letter will explain.    T. C. ROWLAND."

The defendant received this telegram on the following day, and immediately dispatched a postal card to the plaintiffs as follows:

"ST. LOUIS, Mo., February 5, 1889.

"*Dear Sirs :*—Your order through our Mr. Rowland at hand. Will be shipped promptly. Thanks.

"Yours, etc.,

"ROBINSON & Co."

On the following day, February 5, the plaintiffs sent the following dispatch to defendant :

" W. U. Tel. Co.,     Day.     11 : 35 A. M.     Paid.
"February 5, 1889.
" *Robinson & Co., Produce Dealers, St. Louis, Mo. :*

" Will you ship potatoes to-day as ordered by your agent, Mr. Rowland, last night, for our account? Answer quick, our expense. We want to figure on future business. Wire route and car numbers.
"CAMPBELL BROS."

To this the defendant immediately replied by telegraph as follows :

" ST. LOUIS, Mo., 2—5, 1889.
" *To Campbell Bros., Shreveport, La. :*

" Will ship to-morrow ; weather very cold to-day ; advise with us for any future orders.
"ROBINSON & CO."

On the next day the defendant, having received the order by letter of their agent, and having discovered the price and place of delivery at which he had agreed to sell the goods, sent by telegraph the following message to the plaintiffs :

" ST. LOUIS, Mo., 2—6, 1889.
" *Campbell Bros., Shreveport, La.:*

" Letter from Rowland with order just in. *Differs from his telegram price.* Cannot accept. Will not ship.     ROBINSON & CO."

On the same day the defendant mailed to the plaintiffs the following letter of explanation :

"February 6, 1889.
" *Campbell Bros., Shreveport.:*

" DEAR SIRS :—We are in receipt of telegram from T. C. Rowland, stating that he had sold three hundred barrels of home-grown Early Ohios at $1.10 per barrel. We were in doubt about this being correct, as it states they were sold for eating potatoes. We wired him to explain his telegram, and to-day his letter comes stating, sold the Early Ohios for eating potatoes at $1.10,

delivered. We wired you at once : ' Will not fill such an order.' There is no sense in a man trying to sell our home-grown Early Ohios, as eating potatoes. They are only intended for the poorest class of seed, and would not satisfy one as an eating potato. We cannot fill such an order either satisfactorily to ourselves or to anyone else. We so notified you. The very idea of attempting to put such stock in the country as eating potatoes is folly.    Yours,

"ROBINSON & Co."

After thus repudiating the transaction on the ground that "Early Ohios" could not be used for eating potatoes, and after receiving another telegram from the plaintiffs announcing their intention to hold him to the bargain, the defendant, on the eighth of February, mailed to the plaintiffs the following letter in which he disclosed to the plaintiffs for the first time the real ground of his refusing to carry out the bargain, which was that the potatoes had been sold at *too low a price :*

"February 8, '89.

"*Campbell Bros., Shreveport.:*

"DEAR SIRS :—Your telegram at hand. We are ready and willing to deliver to you here three hundred barrels home-grown Early Ohio potatoes at $1.10 per barrel, deducting amount of freight to Shreveport, you to have them accepted here and paid for. Now we will explain our position fully in this matter. Mr. Rowland wired us that sale Ohios as eating potatoes—and we, feeling that no man would buy home-grown Ohios as eating potatoes, put our men to work barreling Northern Peerless to fill the order for you. A little later another telegram from Mr. Rowland said : ' Do not ship until you get letter.' In the meantime your telegram came in, asking when we would ship, and supposing, of course, the price was $1.10 here, good enough to let us out even on the Peerless, we wired you 'next day.' But next day Rowland's letter came in ordering three hundred

barrels home-grown early Ohios at $1.10 per barrel *delivered in Shreveport*. This put a stop to our putting up ' Peerless' that cost us fully $1.10 per barrel here, but it also raised the question in writer's mind, who would accept these ' home-grown Ohios' as eating stock ? We wired you at once ' would not ship,' for we know full well you would not have received them from us. Now there is a small margin in the early Ohios at that price, even $1.10 delivered, but will you accept and pay for such stock right here, thus releasing us from any trouble in the matter ? We can refer to the best houses here as to standing ; but to ship you early Ohios, and take the chance of your accepting, is folly. Mr. Rowland does not know an early Ohio from any other potato, possibly ; but he knew by the price it was the cheapest potato in the market, and that there was a small margin in it for us. You cannot find a dealer here that would ship them as eating potatoes. But we will fill your order, just as sent us, provided you pay for and accept *them at our store*. Any good merchant here can be appointed by you to inspect. Our refusal to ship is simply that ' Early Ohios' will not suit you as eating potatoes, and the price will not justify us in giving you anything else.                    ROBINSON & Co."

Outside the memorandum itself, the plaintiffs adduced explicit evidence to the effect, that the memorandum expressed the contract which was actually made between them and the defendant's agent.

Having thus, in his correspondence with the plaintiffs, shifted his position as to his reason for repudiating the contract made by his agent, the defendant, in his evidence at the trial, took a new position, namely, that the contract had never been made, and undertook to support this position by the deposition of the agent Rowland. As the case evidently turned on this deposition, we set it out entire : " On the fourth day of February, 1889, I was in the city of Shreveport, and sold to

Campbell Bros., on that day, three hundred barrels of Ohio eating potatoes. The price at which I sold them was $1.10 per barrel. A telegram to my employers, ordering these potatoes shipped out to Campbell Bros., was written by one of their representatives, who also paid for the transmission of the telegram. I signed the telegram after it had been written by the said representative of Campbell Bros. I had no authority from my employers to contract for delivery of goods except at St. Louis. As already stated, I sold the potatoes at $1.10 per barrel, and my understanding was that this price was for the potatoes F. O. B., St. Louis (meaning free on board at St. Louis). While I was writing up the order for the potatoes in my order book, Mr. Campbell wrote up what I took to be a duplicate of my order and handed it to me, to be signed. I glanced over this paper hastily and noticed that the quantities and prices were correctly stated, and signed the same. Some time after this, on the same day, while in conversation with Mr. Campbell, he remarked that I sold them the potatoes at $1.10 *delivered in Shreveport.* Then it occurred to me that perhaps it was stated in the paper I had signed (leaf in blank book), that the potatoes were to be *delivered* in Shreveport at $1.10; when I asked to again see the paper I had signed, which did specify that the potatoes were to be delivered in Shreveport at $1.10. Soon after this, I told Mr. Campbell that there was a mistake in the price made, as specified in the paper referred to, on the potatoes as delivered in Shreveport at $1.10, and that $1.10 was lowest St. Louis price, and I asked Mr. Campbell to let me correct the, as I thought when I signed it, duplicate order, and he refused to allow me to correct it, and insisted that he should demand that the goods should be *delivered* at the price; when I repeated to him that I did not intend to sell the potatoes at $1.10 delivered in Shreveport. The telegram referred to in the commencement of this deposition was read to me, and it really constituted my order for the

three hundred barrels of potatoes, a copy of which tele-
gram I attached to this deposition, marked exhibit A,
and which is made part of this deposition. I know that
the potatoes sold cost my employers at least eighty-five
cents per barrel, and I would not of course knowingly
or intentionally agree to have delivered them in Shreve-
port at $1.10, when I also knew that the freight from
St. Louis to Shreveport was at that time twenty-nine
cents per one hundred pounds in car lots."

On the evidence contained in this deposition ( for
there was none other setting up the same hypothesis of
fact), the court, at the request of the defendant, gave
to the jury the following instruction :  "If the jury find
from the evidence that the plaintiff induced T. C. Row-
land, defendant's traveling salesman, to sign the paper,
of date February 4, 1889, read in evidence, with the
intent to cheat or defraud defendant in the matter of
the sale of three hundred barrels of potatoes, and if the
jury further find from the evidence that said Rowland
was, by the fraud or circumvention of plaintiffs, or
either of them, induced to sign said paper, without
knowing its contents, then plaintiffs cannot recover."

The evidence, which we have quoted, afforded no
hypothesis which warranted the giving of this instruc-
tion.   Giving to that evidence its fullest effect in favor
of the defendant, it utterly failed to show that the
defendant's agent was induced by the fraud or circum-
vention of the plaintiffs to sign the memorandum in
question.   Rowland goes no further than to use the
word "mistake " in speaking of the matter. . He does
not even deny that it was *plaintiffs'* understanding that
the goods were to be delivered at Shreveport ; but he
says, " *My* understanding was that this price was for
the potatoes F. O. B. ( meaning free on board ), St.
Louis."   His deposition at most tends to show that, at
the time when the memorandum was signed, the parties.
understood the bargain differently ; that he understood
that it was delivery free on board in St. Louis, while

they may have understood that it was delivery in Shreveport. They drew up and placed the memorandum before him to be signed, embodying the contract as they understood it. In all this there was not the slightest appearance of fraud, circumvention or of anything else inducing him to sign the contract, save his free will, and the bargain which he had made. The fact that he took the memorandum, which Mr. Campbell wrote up, to be a duplicate of the order which he at the same time was writing up in his order book,—a most improbable confusion,—and the further fact that he glanced over it "hastily, and noticed that the quantities and prices were correctly stated, and signed the same," without noticing what the terms of the contract were as to the place of delivery, afford no excuse in law for the refusal of the defendant to keep the contract as written.

The principle that a party, who is *sui juris*, cannot, in the absence of fraud or imposition, deliberately sign a written contract, and then escape its obligation on the ground that he did not know its contents, has been so often decided in this state and elsewhere, that it seems useless to cite authorities upon the subject. In *Taylor v. Fox*, 16 Mo. App. 529, this court, speaking upon this question, said : " A person, who is *sui juris*, cannot deliberately sign a contract in writing, and then, in the absence of evidence creating any inference of fraud or imposition, be heard to say that such instrument is not his agreement." In *Rothschild v. Frensdorf*, 21 Mo. App. 323, this truism was repeated. The principle has been constantly applied in this state in cases, where the shippers of goods have signed the printed stipulations imposed upon them by carriers in contracts of affreightment, although such stipulations are printed in fine type and in a manner to escape observation. *Brown v. Railroad*, 18 Mo. App. 567. This principle was again reaffirmed by the Kansas City Court of Appeals in *Robinson v. Jarvis*, 25 Mo. App. 421.

Our supreme court in *Gwin v. Waggoner*, 98 Mo. 315, 328, reaffirmed it, holding that the mere failure of a party, through his own fault and neglect to read an agreement which he signs, and to inform himself as to its contents, is not sufficient to overcome the legal effect of the instrument.

This principle controls the case before us. There was no evidence tending to show any trick, deception or imposition, practiced by the plaintiffs, or either of them upon the agent of the defendant, to induce him to sign the contract. There was no evidence tending to show that, when they laid the writing before him for his signature, they told him that the goods were deliverable in St. Louis, and not in Shreveport, or that they made any representation to him that the contract was otherwise than as written, or that they said anything whatever to him as to its contents. The evidence, on which this instruction is based, even falls short of showing that the memorandum, as thus written by them, and laid before him, did not express their understanding at the time of the contract. On the contrary, when the defendant's agent discovered that he had sold the potatoes to the plaintiffs at too low a price, and came back and told them that it was a mistake, his evidence tends to show perfect frankness on their part. In short, there is no evidence whatever—not a scintilla—tending to show any "intent to cheat or defraud the defendant," to borrow the language of this instruction, or that the agent of the defendant, to quote again from the instruction, " was, by the fraud or circumvention of plaintiffs, or either of them, induced to sign said paper without knowing its contents."

For the giving of this instruction the judgment of the circuit court will be reversed and the cause remanded. All the judges concur.